MANUEL PEREIRA & others *vs.* NEW ENGLAND LNG CO., INC.

Bristol.    April 3, 1973. — September 17, 1973.

Present: TAURO, C.J., REARDON, QUIRICO, HENNESSEY, & KAPLAN, JJ.

*Gas. Public Utilities. Fire Prevention. Flammable Substance. Equity Pleading and Practice, Stipulation. Statute, Construction. Evidence, Judicial notice.*

A gas company, as defined by G. L. c. 164, § 1, which had obtained required approval of the Department of Public Utilities under § 105A to construct and operate a propane and liquified natural gas storage and distribution facility, need not also obtain a license from the municipal licensing authority under the provisions of G. L. c. 148, § 13, dealing with storage of explosive and flammable substances; § 105A vests paramount regulatory power for such a facility in the Department. [113-123]

A stipulation by a gas company in a suit in equity that propane gas and liquified natural gas are substances which "come within the language of" G.L. c. 148, § 9, did not preclude the company from contending that the paramount power of regulating the storage and distribution of such substances is in the Department of Public Utilities under c. 164,

§ 105A, and excludes the necessity for a license from a municipal licensing authority under c. 148, § 13. [114-115]

If a general statute and a specific statute cannot be reconciled, the general statute must yield, especially where the specific statute was enacted after the general statute. [118-119]

This court took judicial notice of certain unsuccessful attempts to amend a statute. [122]

BILL IN EQUITY filed in the Superior Court on December 29, 1971.

The suit was heard by *Mitchell, J.*

*Acheson H. Callaghan, Jr. (Reginald H. Howe* with him) for the defendant.

*Michael Sahady (Douglas F. MacPhail,* of New Jersey, with him) for the plaintiffs.

*Hans F. Loeser, Roger I. Abrams & Henry P. Monaghan,* for Boston Gas Company & others, amici curiae, submitted a brief.

QUIRICO, J.   This is a bill in equity by which the plaintiffs ask the court to determine and declare whether the defendant is entitled to use certain parcels of land located in Fall River, in Bristol County, together with buildings, equipment and facilities to be erected thereon, for the temporary storage, transportation and distribution of propane gas, and ultimately for the permanent liquefaction, storage, transportation and distribution of liquefied natural gas (LNG). The case was submitted to a judge of the Superior Court on a case stated. Thereafter the judge entered a final decree (a) declaring that the defendant could not use the premises and facilities for the intended purpose without first obtaining a license from the municipal authorities under G. L. c. 148, § 13, as amended, and (b) enjoining the defendant's use of the premises for such purpose unless it first obtained such a license. The case is before us on the defendant's appeal from the final decree.

The following are the agreed facts, stripped of many details not material to the limited issue before us. The defendant is a Massachusetts corporation engaged in the business of buying, selling and distributing gas. It is a natural gas company within the meaning of the Federal Natural Gas Act

and it holds a certificate of public convenience and necessity issued to it by the Federal Power Commission authorizing it to engage in the proposed LNG business, subject to the acquisition of supplies of LNG. It proposes to conduct its business on and from 22.17 acres of land (the locus) bordering on Mount Hope Bay in Fall River. One plaintiff owns and resides on property abutting the locus, and the other five plaintiffs own and reside on property located in the immediate vicinity of the locus.

The defendant proposes to build a liquefaction and storage facility for LNG on the locus, to import LNG by ship from foreign and domestic sources, to process and store it at the locus and to sell and distribute it to gas distribution companies in various locations throughout Massachusetts and New England. The facility will include three storage tanks aboveground, each having a capacity of 600,000 barrels, and the overall size of each being about 250 feet in diameter and 107.5 feet in height. Each tank will be located within an impounding area inclosed by a dike seventeen feet in height. Ships delivering natural gas to the locus will be unloaded by means of two pipelines extending betweeen the facility and a pier in Mount Hope Bay. Shipments from the facility will be (a) by pipeline to the Fall River Gas Company or to the Algonquin Gas Transmission Company, a natural gas pipe line company, and (b) by barge, rail or truck to other gas distribution companies. The facility will also include one building to house liquefaction machinery and one to house administrative offices and control facilities.

At the start of its operation the defendant proposes to use one of the tanks at the locus for the storage and distribution of propane, and ultimately to shift to the storage and distribution of LNG as the latter becomes available. Ultimately, perhaps in about six years, the handling of propane will be phased out and the facility will be used only for LNG if sufficient quantities of the latter become available. The peak demand for gas in Massachusetts and the rest of New England occurs in the winter months and the two pipeline companies supplying this area have not been able to meet the increasing

demand. By contrast, gas is available during the summer months when the demand for it is at its lowest level. The defendant's facility would be able to store available gas during the summer months for sale and delivery to gas companies when they experience the peak demands of the winter months.

On July 16, 1971, the defendant filed a petition with the Department of Public Utilities (Department) requesting (a) that its proposed use of the locus and the facilities to be erected thereon for the processing, storage, sale and distribution of propane and LNG to gas distributing companies be exempted from the operation of the zoning ordinance of Fall River under the provisions of G. L. c. 40A, § 10, inserted by St. 1954, c. 368, § 2,[1] and (b) that the Department approve "the manner in which and the pressures at which gas, both propane and LNG is to be stored, transported and distributed in connection with the proposed LNG storage and regasification equipment and related facilities." The latter request was made under the provisions of G. L. c. 164, § 105A, inserted by St. 1932, c. 119.[2]

After giving notice and holding a public hearing on the defendant's petition, the Department decided "that the proposed situation of the parcel of land in question and the proposed facilities for the storage, transportation, processing and distribution of liquid natural gas and propane gas to be

[1]This statute reads as follows: "A building, structure or land used or to be used by a public service corporation may be exempted from the operation of a zoning ordinance or by-law if, upon petition of the corporation, the department of public utilities shall, after public notice and hearing, decide that the present or proposed situation of the building, structure or land in question is reasonably necessary for the convenience or welfare of the public." Since the Department found that the locus "is zoned industrially, adjacent to the Fall River gas plant," it is not clear whether any exemption from the operation of the zoning ordinance was necessary. However, nothing turns on this point.

[2]This statute reads as follows: "Authority to regulate and control the storage, transportation and distribution of gas and the pressure under which these operations may respectively be carried on is hereby vested in the department [of public utilities]. Upon the filing with the department of a written complaint of the mayor of the city or selectmen of the town where a gas company is operating, or of twenty of its consumers, either as to the manner in which or pressure at which gas is being or shall be stored, transported or distributed, the department shall notify said company . . . and shall thereupon, after notice, give a public hearing to such petitioner and said company, and after said hearing may make such order, if any, as it may deem necessary. Such order may likewise be made by the department after notice and hearing as aforesaid upon its own motion or on petition of the company."

erected therein and thereon are reasonably necessary for the convenience and welfare of the public," and on the basis thereof it ordered that the locus and facilities to be constructed thereon "be and hereby are exempted from the operation of the zoning ordinance of the City of Fall River under the provisions of section 10 of Chapter 40A of the General Laws," subject to certain prescribed conditions. No party to this proceeding has questioned the validity of the Department's decision and order. Neither has any party questioned the power of the Legislature to provide by statute, either expressly or impliedly, that a decision by State regulatory authorities shall prevail over that of municipal regulatory authorities as to a use of land or an operation thereon over which both levels of authority appear to be permitted to act. See *Board of Appeals of Hanover* v. *Housing Appeals Comm. in the Dept. of Community Affairs,* 363 Mass. 339, 355-360.

The only legal question presented by this case is whether the defendant, having obtained the required approval of the Department for the construction and operation of its proposed facility at the locus, must, in addition thereto, also obtain a license therefor from the municipal authorities under the provisions of G. L. c. 148, § 13, as amended through St. 1959, c. 353, § 1.[3] We hold that it is not required to obtain such a municipal license.

---

[3]The pertinent provisions of G. L. c. 148, as amended, are the following: *Section 9:* "The board [of fire prevention regulations established under G. L. c. 22, § 14] shall make rules and regulations for the keeping, storage, use, manufacture, sale, handling, transportation or other disposition of gunpowder, dynamite, crude petroleum or any of its products, or explosive or inflammable fluids or compounds, tablets, torpedoes or any explosives of a like nature, or any other explosives, fireworks, firecrackers, or any substance having such properties that it may spontaneously, or acting under the influence of any contiguous substance, or of any chemical or physical agency, ignite, or inflame or generate inflammable or explosive vapors or gases to a dangerous extent, and may prescribe the location, materials and construction of buildings to be used for any of the said purposes. . . . Cities and towns may also make and enforce ordinances and by-laws, not inconsistent with said rules and regulations, relative to the subject matter of this section."

*Section 13:* "No building or other structure shall . . . be used for the keeping, storage, manufacture or sale of any of the articles named in section nine, unless the local licensing authority shall have granted a licence to use the land on which such building or other structure is or is to be situated for the aforementioned uses, after a public hearing, notice of the time and place of which hearing shall have been given . . . [to such persons and in such manner as specified in this section], and unless the

The defendant argues that since G. L. c. 148, §§ 9 and 13, requiring municipal licenses for the storage of certain substances contain no express reference to "gas," whereas G. L. c. 164 § 105A, which is part of a comprehensive statutory pattern for the regulation of gas companies by the Department, expressly vests authority in the Department "to regulate and control the storage, transportation and distribution of gas and the pressure under which these operations may respectively be carried on," the latter statute must prevail.

The plaintiffs, on the other hand, argue that although G. L. c. 148, §§ 9 and 13, do not use the word "gas," they do use the words "crude petroleum or any of its products," that propane and LNG are products of crude petroleum, and that therefore a municipal license is required for their storage, transportation and distribution. They argue further that the defendant is barred from contending to the contrary because of the following agreement in the case stated: "Both propane and LNG are substances that come within the language of . . . [G. L. c. 148, § 9, and G. L. c. 164, § 105A]."

Of course, the defendant is bound by its stipulation in the case stated (*Savage* v. *Blanchard,* 148 Mass. 348, 350, *Abbott* v. *Link-Belt Co.* 324 Mass. 673, 677, and *Dalton* v. *Post Publishing Co.* 328 Mass. 595, 599) unless the court vacates it as improvident or not conducive to justice (*Malone* v. *Bianchi,* 318 Mass. 179, 182-183, and cases cited, and *Loring* v. *Mercier,* 318 Mass. 599, 601). We assume that the defendant did not intend to stipulate itself out of court or to concede that it was not entitled to use the locus for the intended purpose when it agreed that "[b]oth propane and LNG are substances that come within the language" of G. L. c. 148, § 9. While that stipulation may preclude the defendant from now contending that propane and LNG do not come within the language of § 9, it does not preclude it from

application for such license shall have endorsed thereon the certificate of approval or disapproval of the head of the [local] fire department . . .

"Any license granted hereunder . . . may be revoked for cause, after notice and a hearing given to such owner or occupant, by the local licensing authority or by the [State fire] marshal."

contending, as it does, that § 9 has no application to this case because of G. L. c. 164, § 105A. As thus construed, the stipulation is not decisive of this case, and we need not, and do not, exercise our power to vacate it.

We therefore assume by reason of the stipulation, but without so deciding, that we have two different statutes, G. L. c. 148, § 9, and G. L. c. 164, § 105A, which, despite their differences in language, both purport to include propane and LNG as substances which are subject to regulation thereunder, the regulation under c. 148 to be by municipal authorities and under c. 164 by the Department. The applicability of c. 164, § 105A, providing for regulation by the Department is not questioned. The question is whether G. L. c. 148, §§ 9 and 13, also apply to the defendant's proposed operations. If they do, the defendant's right to use the locus and facilities thereon for the storage, distribution and transportation of propane and LNG will be subject to regulation and licensing by two levels of government, one State and the other municipal. If that is the effect of the statutes, it would be within the power of the municipal authorities to render the action of the Department, a State authority, a nullity. We must determine, on the basis of the familiar rules of statutory interpretation, whether the Legislature intended that result.

1. "The intention of the General Court in enacting any statute must be ascertained, not alone from the literal meaning of its words, but from a view of the whole system of which it is but a part, and in the light of the common law and previous statutes." *Armburg* v. *Boston & Maine R.R.* 276 Mass. 418, 426. *Boston* v. *Quincy Mkt. Cold Storage & Warehouse Co.* 312 Mass. 638, 644. For this purpose, we consider the several statutes in question, not in isolation but in relation to each other and to other statutes, resorting to their origins, their historic development, and their present language.

We note that the Legislature has concerned itself with the regulation of the manufacture and storage of crude petroleum since as early as 1866 (St. 1866, c. 285) and with the

sale and transportation of explosive substances since as early as 1871 (St. 1871, c. 6). In 1904 (St. 1904, c. 370) it incorporated into the statute the language "crude petroleum or any of its products" which is in G. L. c. 148, § 9, today. At the same time it established the pattern of authorizing the State fire marshal to make regulations for the storage of specified explosive or inflammable substances and of authorizing the municipal authorities to license premises to be used for the keeping, storage, manufacture or sale of such substances. In 1945 (St. 1945, c. 710, § 3) it transferred the power to make regulations from the State fire marshal to the board of fire prevention regulations established under G. L. c. 22, § 14. The pattern for the regulation of the manufacture, storage, sale and transportation of such substances as thus developed, with other provisions not material to this opinion, are now found principally in G. L. c. 148, §§ 9 and 13.

In a footnote in its brief the defendant purports to cite all of the decisions by this court dealing with municipal licenses under G. L. c. 148, § 13. We note that most of them deal with the storage of gasoline and oil at gasoline service stations, and that none of them appears to involve the storage of gas. In any event, none of them appears to involve the storage of any substance by a "gas company" as defined in G. L. c. 164, § 1,[4] or by a "natural gas pipe line company" as defined in G. L. c. 164, § 75B, inserted by St. 1950, c. 462.[5] The plaintiffs have cited no decisions of this court involving such companies in connection with municipal licenses under § 13, and we are aware of none.

The earliest indications of the regulation of the gas industry by the Legislature consist of a long series of special acts

---

[4]This definition for a "gas company" is: "a corporation organized under the laws of the commonwealth for the purpose of making and selling, or distributing and selling, gas within the commonwealth . . .."

[5]This definition for a "natural gas pipe line company" is: [a]ny corporation organized under the laws of the commonwealth or of any other state of the United States which holds a certificate of public convenience and necessity issued under the provisions of the federal 'Natural Gas Act', approved June 21, 1938, authorizing it to construct a natural gas transmission line and appurtenant facilities within the commonwealth."

enacted between 1846 and 1855 creating or otherwise relating to corporations authorized to manufacture and sell gas in particular cities and towns. The first general statute on this subject was St. 1855, c. 146, authorizing the formation of corporations for the manufacture and sale of gas without the necessity of a special act for each such corporation. Section 3 of that statute contained the provision that "[t]he selectmen of any town, and the mayor and aldermen of any city, in which any pipes or conductors of any such corporation shall be sunk, shall, at all times, have the power to regulate, restrict, and control, all the acts and doings of such corporation which may in any manner affect the health, safety, convenience, or property, of any part of the inhabitants of such town or city." This was the progenitor of G. L. c. 164, § 75, which now provides that "[t]he aldermen or selectmen may regulate, restrict and control all acts and doings of a corporation subject to this chapter which may in any manner affect the health, safety, convenience or property of the inhabitants of their towns." The plaintiffs contend that the latter statute is a clear indication that the Legislature did not intend to exclude municipalities from the area of the regulating of gas companies.

The first statute to subject gas companies to broad supervision at the State level was St. 1885, c. 314,[6] which established the "board of gas commissioners" and gave to it some of the powers now vested in the Department with respect to gas companies. Section 8 of that statute provided that "[s]aid board shall have the general supervision of all corporations engaged in the manufacture and sale of gas for lighting and for fuel, and shall make all necessary examinations and inquiries and keep themselves informed as to the compliance of the several corporations with the provisions of law." This was the progenitor of G. L. c. 164, § 76, which now provides that "[t]he department shall have the general

---

[6]An earlier statute, St. 1861, c. 168, had established the office of "inspector of gas meters and of illuminating gas," prescribed minimum standards for gas and for its measurement, and also prescribed standards for the testing of gas meters. Successor provisions are now contained in G. L. c. 164, §§ 103, 104, 109, 112, 113, 114 and 116.

supervision of all gas and electric companies and shall make all necessary examination and inquiries and keep itself informed as to the condition of the respective properties owned by such corporations and the manner in which they are conducted with reference to the safety and convenience of the public, and as to their compliance with the provisions of law and the orders, directions and requirements of the department."

Thus the statutory backdrop against which the Legislature inserted G. L. c. 164, § 105A, by enacting St. 1932, c. 119 was the following. By G. L. c. 148, §§ 9 and 13, municipalities were authorized to issue licenses for the "keeping, storage, use, manufacture [or] sale" of various inflammable and explosive substances, including "crude petroleum or any of its products," and by G. L. c. 164, § 75, they were given authority to "regulate, restrict and control all acts and doings of a . . . [gas company] which may in any manner affect the health, safety, convenience or property of . . .[their] inhabitants." By G. L. c. 164, § 76, the Department was given "the general supervision of all gas . . . companies," with power to make necessary examinations and inspections and to enforce compliance with applicable laws and its "orders, directions and requirements." By enacting § 105A in 1932, the Legislature vested authority in the Department "to regulate and control the storage, transportation and distribution of gas and the pressure under which these operations may respectively be carried on."

2. We next consider the fact that G. L. c. 148, §§ 9 and 13, contain general provisions dealing with fire and other safety hazards and the requirement for a municipal license for the keeping, storage, use, manufacture, sale, handling, transportation or other disposition of a large variety of explosive and inflammable substances, whereas G. L. c. 164, § 105A, deals solely and specifically with gas. If a general statute and a specific statute cannot be reconciled, the general statute must yield to the specific statute. This is particularly true where, as here, the specific statute was enacted after the general statute. *Copeland* v. *Mayor & Aldermen of Spring-*

*field,* 166 Mass. 498, 504. *Clancy* v. *Wallace,* 288 Mass. 557, 564.

3. This is the first case in which we have been asked to interpret G. L. c. 164, § 105A. By contrast, we have been asked in a number of cases to interpret G. L. c. 40A, § 10, giving the Department the power to exempt public utilities from local zoning ordinances and by-laws. We believe that our reasoning in determining the legislative intent in interpreting the latter statute applies equally to § 105A. In *New York Cent. R. R.* v. *Department of Pub. Util.* 347 Mass. 586, 592, we said: "The power to exempt public utilities from local zoning by-laws was given by c. 40A, § 10 . . . to a State department, not to a local board. This fact indicates that the Legislature intended a broad and balanced consideration of all aspects of the general public interest and welfare and not merely examination of the local and individual interests which might be affected. The department's powers are not restricted by any such language as that which limits the authority of a local board of appeals to grant a variance under c. 40A, § 15, cl. 3 . . .. We hold that in considering an application . . . for an exemption under § 10, the department is empowered and required, not only to consider the effect of a new facility upon the local community and upon persons living near by, but also to weigh the public effects of the requested exemption in the State as a whole and upon the territory served by the applicant."

In *Mezitt* v. *Department of Pub. Util.* 354 Mass. 692, this court affirmed the Department's decision granting exemption from a zoning by-law under G. L. c. 40A, § 10, "to erect a plant to liquefy, store and re-deliver natural gas, including a compressor building, a processing complex and underground reservoirs" (693-694) on a site of about ninety-eight acres in Hopkinton. At p. 695 of the opinion we said: "With any rezoning that increases the business use of what had been a residential area, some adverse effect on the value of adjacent or nearby land is a possible and, in many cases, a likely concomitant. This is a consideration for the rezoning authority. In this case the Department is given the rezoning

power because the public 'convenience or welfare' (G.L. c. 40A, § 10) to be considered is that of the entire area of the Commonwealth served by the regulated utilities using the gas to be stored. . . . The need and the advantages of the plant were shown in the uncontroverted evidence, and the Department was fully justified in finding that 'the proposed situation of the parcel . . . and the type of structures to be erected thereon are reasonably necessary for the convenience and welfare of the public.' "[7]

The same considerations of public policy which influenced the Legislature to authorize the Department, by the express language of G. L. c. 40A, § 10, to grant a public utility company an exemption from local zoning regulations whenever reasonably required for the public convenience or welfare of the "entire area of the Commonwealth served" by the utility (*Mezitt* v. *Department of Pub. Util., supra*) support the conclusion that by its enactment of G. L. c. 164, § 105A, the Legislature intended to give, and did give, substantially similar paramount power to the Department further to regulate and control "the storage, transportation and distribution of gas and pressure under which these operations may respectively be carried on" in this Commonwealth. These two

---

[7]In both the *Mezitt* case and the present case, the Federal Power Commission had issued a certificate of public convenience and necessity for the proposed facilities for the storage and other handling of LNG before the Department acted thereon. The opinion in the *Mezitt* case makes no reference to G. L. c. 164, § 105A. However, it does contain the following statement at p. 698: "State authority is substantially limited in respect of a site found by a Federal agency to be reasonably necessary for an interstate facility. *New York State Natural Gas Corp.* v. *Elma,* 182 F. Supp. 1, 6 (W. D. N. Y.)." This subject of the extent of the power of municipalities to regulate such operations and facilities authorized under and constructed pursuant to a certificate of public convenience and necessity issued by the Federal Power Commission is also discussed in *United Gas Pipeline Co.* v. *Terrebonne Parish Police Jury,* 319 F. Supp. 1138 (E. D. La.), affirmed in 445 F. 2d 301 (5th Cir.). There the trial judge said, at p. 1140, "Just as Congress intended by the Natural Gas Act to confer exclusive jurisdiction to the Federal Power Commission to regulate commerce in the interstate sale and transportation of natural gas, so also it intended by the Natural Gas Pipeline Safety Act of 1968 to give exclusive jurisdiction to the Department of Transportation to regulate the safety of 'interstate transmission facilities.' The legislative history of the Safety Act makes it clear that Congress intended to avoid dual safety regulation of interstate transmission facilities." See *Tenneco, Inc.* v. *Public Serv. Commn. of W. Va.* 352 F. Supp. 719 (S. D. W. Va.). Neither side to the present case has discussed or argued the question whether the defendant's facilities and operations would be subject to the Natural Gas Pipeline Safety Act of 1968, and our decision therefore does not deal with the question whether the Federal government has preëmpted this field to the exclusion of additional local regulation.

statutes in combination recognize the absolute interdependence of all parts of the Commonwealth and of all of its inhabitants in the matter of availability of public utility services, and they give to the Department the power to take action necessary to insure that all may obtain a reasonable measure of such vital services. See *Board of Appeals of Hanover* v. *Housing Appeals Comm. in the Dept. of Community Affairs,* 363 Mass. 339, 355-360. To hold otherwise would impute to the Legislature an intent to Balkanize the Commonwealth and to permit any single municipality to deny access to such vital services to any and all other municipalities. We do not impute such an intent. "It is not to be presumed that the Legislature intended to give to the local licensing board the authority to thwart the reasonably necessary efforts of the . . . commissioners [of the Department] to perform their duty as agents of the State." *Teasdale* v. *Newell & Snowling Constr. Co.* 192 Mass. 440, 443. *Medford* v. *Marinucci Bros. & Co. Inc.* 344 Mass. 50, 55.

4. General Laws c. 148, § 37, provides in part that "[n]o person shall construct, maintain or use any tank or container of more than ten thousand gallons' capacity, for the storage of any fluid other than water, unless the same is located underground, without first securing a permit therefor from the commissioner [of public safety of the Commonwealth]." Two Attorneys General have given opinions to the Commissioner that, notwithstanding the above quoted provision of § 37, the Department had exclusive jurisdiction over tanks for the storage of LNG. In an opinion dated May 27, 1968, the then Attorney General reviewed the statutes dealing with various phases of the Department's jurisdiction over gas companies, and then said: "It was, in my judgment, the intent of the Legislature to vest in the DPU [Department] comprehensive jurisdiction, at the State level, over gas companies and their operations. Consonant with that intention is the provision in G. L. c. 164, § 105A, . . . wherein the DPU is given authority 'to regulate and control the *storage, transportation* and distribution of gas . . ..'" Rep. A. G.,

Pub. Doc. No. 12, 1968, pp. 195-198. A similar opinion was given by a later Attorney General on December 9, 1971. Rep. A. G., Pub. Doc. No. 12, 1972, pp. 72-74. Both opinions were limited to the subject of the regulatory authority at the State level, and neither one involved the authority at the State level in relation to authority at the municipal level.

5. We take judicial notice of attempts by the Legislature to amend G. L. c. 40A, § 10, in 1972 and 1973. In each of these years the Legislature passed and sent to the Governor a bill (1972 House No. 4898 and 1973 House No. 1768) amending § 10 by adding thereto language to the effect that notwithstanding the provisions of § 10 and of G. L. c. 164, § 105A, no exemption from local zoning regulations granted by the Department with respect to any building, structure or land used or to be used for storage of LNG or propane gas would be valid unless also approved by the municipal authorities. The Governor vetoed the 1972 bill by not signing it, and he vetoed the 1973 bill and returned it to the Legislature. See Part II, c. 1, § 1, art. 2, of the Constitution of the Commonwealth, as amended by art. 63 of the Amendments thereto. An attempt to override the latter veto was defeated in the House of Representatives on August 14, 1973. Both the 1972 and 1973 bills would have required municipal approval only if the gas storage facility was within 2,000 feet distance from a church, school or playground, and both also provided that the municipal approval required thereby be "in the manner provided by section thirteen of chapter one hundred and forty-eight."

These two unsuccessful attempts to amend the statutes are some indication that the Legislature does not consider the present statutes as requiring municipal approval for a gas storage facility approved by the Department under G. L. c. 164, § 105A. See *Burrage* v. *County of Bristol,* 210 Mass. 299, 301; *Lynch* v. *Commissioner of Educ.,* 317 Mass. 73, 80-82; *Doherty* v. *Commissioner of Ins.* 328 Mass. 161, 164.

6. Upon consideration of all the factors discussed above, we hold that at least since the 1932 insertion of G. L. c. 164, § 105A, a "gas company" as defined by G. L. c. 164, § 1, or

a "natural gas pipe line company" as defined by G. L. c. 164, § 75B, which has obtained the required approval of the Department under § 105A for the "storage, transportation and distribution of gas and the pressure under which these operations may respectively be carried on" is not further required to obtain a municipal license for the same operations under G. L. c. 148 § 13. This holding involves no decision whether such a municipal license was required before the enactment of § 105A. Neither does it involve any decision whether such a municipal license is required for the storage, transportation or distribution of gas other than by a gas company or a natural gas pipe line company.

The final decree is reversed and a new decree is to be entered consistent with this opinion.

*So ordered.*