Sosman, J.
Plaintiff William Mattei has brought the present action complaining that defendant Barbara Dortch-Okara, the Chief Justice for Administration and Management of the Trial Court (“CJAM”), lacked the authority to reject his appointment to the position of Chief Probation Officer of the Worcester District Court and that he is now, as a matter of law, entitled to occupy that position. In the alternative, Mattel’s complaint alleges that he is entitled to occupy the position of Chief Probation Officer by way of the doctrine of promissory estoppel.
Defendant has filed a motion to dismiss or, in the alternative, for summary judgment in her favor.[1] Plaintiff has filed a cross motion for summary judgment in his favor on the issue of the scope of the CJAM’s authority to reject his appointment. For the following reasons, defendant’s motion for summary judgment is ALLOWED and plaintiffs cross motion for summary judgment is DENIED.
Facts
Plaintiff William Mattei is presently employed as a probation officer in the Worcester District Court. In the fall of 1998, the position of Chief Probation Officer became vacant. Mattei, along with four other candidates, applied for the position.
The procedure for filling the Chief Probation Officer vacancy was set forth in an Administrative Order promulgated by a former CJAM pursuant to G.L.c. 21 IB, Section 8. That procedure provided that applicants for any Chief Probation Officer position were to be graded by a committee, following which the committee was to forward on to the appointing authority all candidates receiving an average score of 80 on a 100 point scale. Candidates with an average score below 80 were not eligible for appointment.
In accordance with the Administrative Order, the requisite committee was convened to conduct the review and scoring of the five applicants for the Worcester District Court Chief Probation Officer position. After conducting interviews and reviewing the candidates’ credentials, the committee gave plaintiff Mattei a score of 83 and gave a competing candidate, one Frederick McConaghy (presently Chief Probation Officer of the Westborough District Court), a score of 94. The other three candidates all scored below the requisite 80 points, leaving Mattei and McConaghy as the sole eligible applicants.
On February 5, 1999, the Commissioner of Probation forwarded the committee’s scores for Mattei and McConaghy to The Honorable Elliott Zide, the First Justice of the Worcester District Court. Judge Zide then interviewed both Mattei and McConaghy and ultimately chose Mattei for the position. On February 12, 1999, Judge Zide wrote to the Commissioner of Probation notifying him of the selection of Mattei as Chief Probation Officer.
On February 23, 1999, the Commissioner of Probation wrote to the CJAM, with a copy to Judge Zide, informing her of Judge Zide’s selection of Mattei as Chief Probation Officer for the Worcester District Court. The Commissioner went on to recommend against the proposed appointment of Mattei:
In accordance with Massachusetts General Laws Chapter 276, Section 98, I cannot recommend Mr. William Mattei for appointment according to appointment standards promulgated under Massa *313 chusetts General Laws Chapter 21 IB, and all applicable provisions of the Trial Court Personnel Policies and Procedures Manual. The documentation produced by the hiring process does not support Mr. Mattei as being the most qualified candidate for Chief Probation Officer.
The Commissioner’s letter enclosed the documentation concerning the proposed appointment.
On February 26, 1999, Judge Zide wrote his own letter to the CJAM, responding to the Commissioner’s criticism of the proposed Mattei appointment. His letter began, “I write seeking your approval, pursuant to G.L.c. 276, s. 83, of my designation of William P. Mattei as Chief Probation Officer of the Worcester District Court,” and went on to explain that he was writing to the CJAM “because I received a copy of Commissioner John J. O’Brien’s letter saying that he does not support my appointment.” Judge Zide took the position that Mattei was the more qualified candidate, and he stressed that Mattei had received the requisite minimum score to be considered as a qualified candidate.
Judge Zide wrote to the CJAM again by letter dated March 24, 1999. That letter began, “I write seeking your speedy approval of my appointment of William Mattei as Chief Probation Officer of the Worcester District Court.” Noting that he himself was recently sworn in as Presiding Justice, Judge Zide pointed out that “[i]t does not help my cause to have delay in the approval of the most significant decision I made since I began my tenure” and that “[flailure to timely support my decision will be seen here as a blow to my ability to make sound and supportable decisions.” Judge Zide reiterated that Mattei had achieved the requisite score for the position. His letter closed, “For these reasons, I urge you to support my nomination and approve the appointment of William Mattei to be Chief Probation Officer of the Worcester District Court.”
On June 23, 1999, the CJAM wrote to Judge Zide reporting that, in response to a complaint from McC-onaghy, her office had undertaken an investigation of the process by which Mattei had been selected. Based on that investigation, the CJAM had determined that she would “decline to approve the appointment of Mr. Mattei.” The CJAM cited the Trial Court Personnel Policies and Procedures, Section 4.000, which sets forth that the objective of the Trial Court’s hiring procedures is “to select the most qualified individuals who can carry out their responsibilities in a competent and professional manner.” The CJAM noted that, although Mattei had achieved a passing score, the other candidate had scored considerably higher. She acknowledged that the procedures did not automatically require appointment of the highest scoring candidate but, in light of the discrepancy between these two scores and the complaint of unfairness filed by McC-onaghy, the CJAM indicated that she was “not persuaded that Mr. Mattei was the most qualified individual for the position." She instructed Judge Zide to re-post the position and repeat the selection process. To date, he has not done so.
Discussion
I. G.L.c. 21 IB, Section 8
Mattei contends that, pursuant to G.L.c. 21 IB, Section 8, the CJAM’s authority to reject his appointment expired fourteen days after she received documentation showing compliance with the promulgated procedures and that, even within those fourteen days, she could only reject an appointment on account of failure to comply with promulgated standards for appointment. He argues that the CJAM’s letter of June 23, 1999 rejecting his appointment was too late and that, even if it had been timely sent, the CJAM had no authority to reject his appointment because the requisite procedures and standards had been adhered to. He thus claims that his appointment has become effective by operation of law and that he is entitled to an order that he be instated in the position of Chief Probation Officer for the Worcester District Court.
Resolution of Mattel’s claim requires this court to harmonize G.L.c. 21 IB, Section 8, which governs all trial court appointments made pursuant to promulgated standards, with G.L.c. 276, Section 83, which specifically governs the appointment of Chief Probation Officers. With respect to the role played by the CJAM and the extent of her authority over such appointments, the two statutes appear to be in conflict.
The statute relied on by Mattei, G.L.c. 21 IB, Section 8, provides for the promulgation of standards for hiring and promotion of all personnel within the trial court. Once such standards have been Promulgated, appointments are to made thereunder as follows:
Any appointment that is governed by standards promulgated under the provisions of this section shall forthwith be certified in writing for compliance with such standards to the [CJAM]. The [CJAM] shall have the power to reject any such appointment within fourteen days after receipt of the certification of compliance by the appointing authority but such power to reject any such appointment shall be limited to non-compliance with the standards for appointment.
Id. Because appointment to the position of Chief Probation Officer is governed by standards already promulgated by the CJAM, Mattei contends that Section 8 limited both the time within which the CJAM could reject his appointment and the grounds for which she could reject his appointment. There is no dispute that the CJAM’s June 23, 1999 letter was written well beyond the fourteen days after receipt of the documentation certifying compliance, and Mattei thus argues that he is entitled to summary judgment on the ground that the CJAM’s purported rejection of his appointment was untimely.[2]
*314 However, another statute, G.L.c. 276, Section 83, specifically governs appointments to the position of Chief Probation Officer. It provides as follows:
Subject to appropriation, the [CJAM] may appoint, dismiss and assign such probation officers to the several sessions of the trial court as [s]he deems necessary. In any court having two or more probation officers, the first justice, subject to the approval of the [CJAM], may designate one probation officer to serve as chief probation officer and may designate other probation officers to serve as assistant chief probation officers, as he deems necessary for the effective administration of justice.
Id. (emphasis added). Thus, while it is up to the First Justice of any given court to designate the Chief Probation Officer, that designation must be affirmatively approved by the CJAM. The statute places no constraints (either time constraints or substantive constraints) on the CJAM’s discretion with regard to the granting or withholding of her approval of Chief Probation Officer appointments.
Where two statutes that govern the same subject matter are in conflict, the more general statute must yield to the more specific statute. Pereira v. New England LNG Co., 364 Mass. 109, 118 (1973). Here, G.L.c. 21 IB, Section 8 is the more general statute, as it governs generally all appointments of all types and ranks within the trial court, while G.L.c. 276, Section 83 is the more specific statute, governing appointments to the specific position of Chief Probation Officer. The statute specifically addressing the precise appointment at issue in this case gives the CJAM unfettered discretion to withhold her approval of the First Justice’s proposed appointment, and it does not set any time limits on the exercise of her discretion. Under Section 83, the CJAM’s affirmative approval of the appointment of a Chief Probation Officer is a necessary condition to the appointment, and the mere passage of time does not result in any form of approval by default.
Both statutes were rewritten as part of the same legislation in 1992. St. 1992, c.379, Section 76 (amending G.L.c. 21 IB, Section 8) and Section 188 (amending G.L.c. 276, Section 83). Prior to the 1992 amendments, G.L.c. 276, Section 83 had provided for the appointment of probation officers by the judges of each court and had given the CJAM (then referred to as the “Chief Administrative Justice of the Trial Court”) the authority to “review” such appointments “for compliance with the standards promulgated under [G.L.c. 21 IB, Section 8]” and to “rescind” an appointment if it did not comply with those promulgated standards. That former version of the statute also provided that, where a court had two or more probation officers, “one may be designated as chief probation officer,” and specified that, for purposes of that section, the term “probation officer” included “chief probation officer.” By that definition, the selection of “chief probation officer” was to be accomplished by the same method as any other “probation officer”— i.e., by the choice of the justices of the court, subject to review and “rescission” by the CJAM for noncompliance with standards promulgated under G.L.c. 21 IB, Section 8.[3] The former statute also specified that “probation officers” (and therefore “chief probation officers”) could be “removed or demoted for cause by the justices of the court making the appointment,” provided that the CJAM had “authorized” the action “after review for compliance with the standards promulgated under [G.L.c. 21 IB, Section 8].”
By way of the 1992 amendments, the Legislature gave the CJAM, not the justices of the court, the power to “appoint, dismiss and assign such probation officers to the several sessions of the trial court as [s]he deems necessary.” G.L.c. 276, Section 83 (1993 ed.). The power to designate a Chief Probation Officer was then given to the First Justice of each court, “subject to the approval of the [CJAM].” Id. The cross-reference to G.L.c. 21 IB, Section 8 was dropped, as was the specification that the CJAM’s review was to be solely for the purpose of confirming compliance with standards promulgated under G.L.c. 21 IB, Section 8. With regard to discharge of probation officers, the 1992 amendments also transferred that authority to the CJAM and deleted all cross-reference to G.L.c. 21 IB, Section 8.
In this court’s view, the deletion of all cross-references to G.L.c. 21 IB, Section 8 is not unintentional. The 1992 amendments transferred to the CJAM, and away from the justices of the trial court departments, greater authority over the hiring, promotion and firing of probation officers. Under Mattel’s theory, the First Justice of any court would have sole authority to select whatever Chief Probation Officer he wanted as long as his selection met the various appointment standards promulgated by the CJAM, as the CJAM would have no discretion to withhold her approval of such an appointment. That interpretation is contrary to the current version of G.L.c. 276, Section 83, which makes the First Justice’s selection expressly subject to the CJAM’s affirmative approval, and instead replaces it with the former version, which gave the individual courts the power to select their Chief Probation Officers and limited the CJAM’s role to that of making sure that the courts had followed the promulgated procedures and standards.
It is understandable that the Legislature would not give the CJAM the authority to micro-manage each and every trial court hiring decision for all positions. Thus, with respect to personnel decisions in general, G.L.c. 21 IB, Section 8 provides that the appointing authority must make appointments in compliance with promulgated standards and procedures and limits CJAM’s review of ordinary personnel appointments to the issue of compliance with those standards and procedures. However, with specific regard to Chief *315 Probation Officers, it is understandable that the Legislature would give the CJAM final discretionary authority over appointments to those sensitive and important positions and not leave such appointments to the discretion of each court’s First Justice. The Legislature’s determination that appointment to the position of Chief Probation Officer requires express approval from the CJAM, which she may withhold within her discretion, whereas the CJAM’s authority over other hiring decisions will be limited to ensuring that her rules and procedures have been complied with, is a sensible distinction. This distinction can only be enforced by giving precedence to G.L.c. 276, Section 83, the specific statute governing Chief Probation Officer appointments, over G.L.c. 21 IB, Section 8, the general statute governing all trial court personnel decisions.
That the CJAM has promulgated standards concerning the appointment of Chief Probation Officers does not strip her of the discretion she has been given in G.L.c. 276, Section 83. Rather, the Administrative Order has the effect of defining the eligible pool of qualified candidates and preventing the appointment of anyone who fails to meet those criteria. Amongst the candidates who have achieved the minimum score set by the Administrative Order, the CJAM still retains discretion with respect to the selection that is made from that pool of eligible candidates. Neither the CJAM nor the First Justice may appoint anyone who fails to meet the standards set by the Administrative Order, but the mere fact that the First Justice’s proposed appointment is of someone who has achieved the requisite minimum score does not deprive the CJAM of her ability to withhold approval of that particular appointment. Here, the CJAM had justifiable qualms about the selection of someone whose score, although within the passing range, was so notably below that of the other competing candidate. Under Section 83, she therefore exercised her discretion to withhold approval of that appointment.
Accordingly, this court rejects Mattel’s claim that the CJAM lacked the authority to disapprove of his appointment. Where the CJAM has not approved Mattel’s appointment under G.L.c. 276, Section 83, Mattei is not entitled to be instated in the position of Chief Probation Officer.
II. Promissory estoppel
In the alternative, Mattei contends that he received notification from Judge Zide that he had been selected as Chief Probation Officer, that he “changed plans” and “made preparations for his new role as chief probation officer” in reliance on that notification, that he has now been harmed by the CJAM’s failure to approve his appointment, and that injustice can be avoided only if he is now appointed Chief Probation Officer.
Even where the underlying elements of a promissory estoppel claim are established, the principle of promissory estoppel is not ordinarily applied against the government. See LaBarge v. Chief Administrative Justice of the Trial Court, 402 Mass. 462, 468-69 (1988); Phipps Products Corp. v. Massachusetts Bay Transportation Authority, 387 Mass. 687, 693-94 (1982); McAndrew v. School Committee of Cambridge, 20 Mass.App.Ct. 356, 360-61 (1985). As a matter of law, Mattei can not make out the elements that would be necessary for a claim of promissory estoppel as against a private party, and he certainly can not make out such a claim against the CJAM.
The notification from Judge Zide that Mattei had been selected for the position was not any form of promise. It was nothing more than what it purported to be, i.e., that Judge Zide had nominated Mattei for the position.[4] The law was clear (under either G.L.c. 276, Section 83 or G.L.c. 21 IB, Section 8) that there would be further review of such an appointment by the CJAM. To the extent, if any, that Mattei misinterpreted Judge Zide’s notification as some form of “promise” that he would be the next Chief Probation Officer, reliance on such a “promise” would not be reasonable. Not only was the law clear that there would be further review by the CJAM, but within two weeks it was made known to Judge Zide and to Mattei that the Commissioner of Probation was recommending against Mattel’s appointment. It was also known, in the wake of that opposition, that Judge Zide was “lobbying” the CJAM to get the necessary approval. Under the circumstances, Mattei can not claim that he reasonably interpreted Judge Zide’s selection as final.[5]
Even if the elements of promissory estoppel were made out, they would not operate against the CJAM. Allowing Mattel’s misunderstanding of the import of Judge Zide’s selection to eliminate the CJAM’s review of this appointment would be directly contrary to the division of authority created by statute. It is a common feature of public hiring procedures that certain officials or committees have the power to recommend or nominate someone to a position but that that recommendation or nomination must be approved or confirmed by some other official(s) in order to be effective. Those with only the power to recommend or nominate can not transform that power into final hiring authority by “promising” their selected candidates that the appointment is secure. Application of the doctrine of promissory estoppel to such a scenario would wreak havoc in the hiring and promotion of public employees and would effectively place final hiring authority for such positions with persons who are not supposed to have it. Mattei can not avoid the CJAM’s review of his appointment merely by claiming that Judge Zide told him he had been selected as Chief Probation Officer.
ORDER
For the foregoing reasons, defendant’s Motion to Dismiss is treated as a motion for summary judgment and, as a motion for summary judgment, is ALLOWED, plaintiffs Cross Motion for Summary Judg *316 ment is DENIED, and it is hereby ORDERED that judgment be entered in favor of defendant.

Because the motion relies on materials outside the four corners of the complaint, the court treats it as a motion for summary judgment.

He also contends that the CJAM did not have any lawful basis for rejecting his appointment, as he claims that his appointment complied with all the promulgated standards. On this record, it is undisputed that Mattei received above the required minimum score from the screening committee and that his appointment therefore complies with that particular standard. Whether his appointment would comply with all other standards is not clear on this record, and the CJAM's letter suggests that she is of the opinion that, his score notwithstanding, the selection of Mattei did not in fact comply with all other standards.

The case of Glaser v. Chief Justice for Administration and Management of the Trial Court, 416 Mass. 659 (1993), on which plaintiff relies, concerned a Chief Probation Officer appointment occurring in 1989 under the former version of the statute. Thus, in Glaser, the court had to determine whether the CJAM’s rejection of the appointment of a candidate who had failed to achieve the requisite 80 point score was a rejection based on failure to comply with promulgated standards. Because the appointment of someone who failed to achieve the required minimum score would not comply with the standards set in the Administrative Order, the court ruled that the CJAM had validly rejected the appointment. Glaser does not interpret the current versions of G.L.c. 276, Section 83 and G.L.c. 21 IB, Section 8.

At the time of these events, Judge Zide himself understood that express approval from the CJAM pursuant to G.L.c. 276, Section 83 was necessary to make his proposed appointment of Mattei effective and that the appointment would not become effective merely by failure to meet the fourteen day deadline set forth in G.L.c. 21 IB, Section 8. After selecting Mattei, Judge Zide notified the Commissioner of Probation of his decision. The Commissioner promptly (and within less than fourteen days) notified Judge Zide that he would not recommend approval of the selection of Mattei. As a result. Judge Zide wrote directly to the CJAM “seeking [her] approval, pursuant to G.L.c. 276, s. 83" of his decision. A month later, well after the now proposed fourteen-day time limit had expired, Judge Zide again wrote to the CJAM "seeking [her] speedy approval" of Mattel's appointment. Included in his reasons as to why the appointment should be approved was the assertion that failure to approve the appointment would undercut his authority as the new First Justice. Nowhere did Judge Zide suggest that, on account of the CJAM’s failure to disapprove the appointment within fourteen days, Mattei was now Chief Probation Officer pursuant to G.L.c. 21 IB, Section 8. Nor did his letters suggest that, because all standards and procedures had been complied with, there was no lawful basis for the CJAM to withhold her approval of Mattei. Rather, both the CJAM and Judge Zide understood that, absent affirmative approval from the CJAM under G.L.c. 276, Section 83, Mattei’s appointment would not be effective. Judge Zide's letters to the CJAM urged her to exercise her Section 83 discretion in favor of the appointment. Judge Zide did not then believe or then contend that the CJAM’s discretion was circumscribed by G.L.c. 21 IB, Section 8 or that she lacked authority to withhold her approval, and no such contention or belief on his part would have been communicated to Mattei.

Nor does there appear to be any damage to Mattei that would rise to the kind of serious injustice necessary to invoke the doctrine of promissory estoppel. At oral argument, Mattel's counsel indicated that the actions Mattei took in ostensible reliance on the appointment consisted of redecorating the office he thought he would have as Chief Probation Officer. Promissory estoppel is an equitable doctrine that enforces all otherwise unenforceable promise only where that enforcement is necessary to avoid injustice. It does not operate to remedy every minor expenditure of money or effort made in reliance on another’s promise, nor is it intended to remedy mere personal disappointment.